UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TISHA HILARIO,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ALLSTATE INSURANCE COMPANY,<br><br>　　　　Defendant. | Case No. 3:20-cv-05459-WHO<br><br>**ORDER CERTIFYING CLASS**<br>Re: Dkt. No. 73 |

This case is about how the defendant, Allstate Insurance Company, calculates the square footage of houses for homeowners' insurance, specifically its alleged double counting of built-in garage space due to a faulty transition to new insurance software. Plaintiff and purported class representative Tisha Hilario initiated the action in 2020 and now moves to certify a class. I narrow her proposed class definition and grant her motion for certification.

## BACKGROUND

### I.　　Factual Background

This dispute arises from homeowners' insurance policies covering houses in California, including the home that plaintiff Tisha Hilario owns in San Francisco. *See* Motion for Class Certification ("Mot.") [Dkt. No. 73], at 15:4-7; First Amendment Complaint ("FAC") [Dkt. No. 41] ¶¶ 5, 21. Hilario has held homeowners' insurance through Allstate since 2004. Opposition to Class Certification ("Oppo.") [Dkt. No. 76] at 9:4. She alleges that in 2019, she received "a purposefully vague form letter" from Allstate that her policy information might be changing. Mot. 7:13-8:14. She asserts that she discovered that this change ended up double counting the square footage of her garage, causing her to pay more in insurance premiums. FAC ¶ 26. She says that this "double-counting" affected 43,265 people holding homeowners' insurance policies through Allstate. Mot. 7:2.

Allstate uses a third-party tool called Residential Component Technology ("RCT") to determine the cost to completely rebuild a home (estimated replacement cost, "ERC"), which is based on "square footage, location, type, . . . construction materials, . . . number of stories, . . . number of kitchens, bathrooms, etc." Oppo. Ex. 4 ¶¶ 2-3; *see also* Oppo. Ex. 12 42:7-12. The ERC is the minimum coverage amount that Allstate will offer, but customers can elect higher coverage. *Id.* ¶ 7. Allstate agents write policies using RCT, determining square footage from sources such as inspections, appraisals, homeowners' estimates, third-party vendors, and public records, including websites like Zillow. *Id.* ¶ 4; Mot. Ex. 5 at 308:21-24; Mot. Ex. 2 at 96:6-20; Mot. Ex 31 at 31:4-32:3. Allstate says that "nearly every customer" has a policy that exceeds the limits provided in their initial square footage estimate. Mot. Ex. 5 at 153:23-154:6.

RCT 3, used before June 13, 2016, Mot. Ex. 1 54:24-55:9, had one field for agents to input square footage. *See* Mot. Ex. 5 at 94:15-17. Into that field, agents inputted the Furnished Living Area ("FLA"), which is the square footage of a home without including built-in garage space. Oppo. 9:7-1; Oppo. Ex. 4 ¶ 15; Oppo. Ex 12 at 94-97; Mot. Ex. 1 at 39:5-23, 57:2-15; Mot. Ex. 5 at 139:11-18; 144:22-146:19. But Allstate switched to a system known as RCT4 in 2016, which used two fields—one for FLA, and one for Total Living Area ("TLA"), which is FLA plus built-in garage square footage. Oppo. 9:14-20; Mot. Ex. 5 60:15-18.

As stated in the discovery documents, the square footage inputted into prior policies was transferred to the TLA field of RCT4, and the program then assumed that number was the correct TLA. Mot. Ex. 1 49:22-50:4; Mot. Ex. 5 at 91:16-92:20; 94:15-24 ("[W]hen RCT 4 was rolled out then the system was assuming that that square footage are included the total living area when in fact it was the finished living area."). To populate the FLA field, RCT4 deducted 288 square feet per built in garage space. Oppo. 9:17; Mot. Ex. 5 at 149:14-19 ("[A]nyone with a built-in garage . . . had . . .the 288 square feet per garage bay . . . automatically deducted when the two fields were created."). That new FLA number was then carried over to policy records, making the "finished living area . . . lower than it should have been." Mot. Ex. 5 at 150:15-22. Allstate estimated that at least 20,000 homes had incorrect FLA due to the conversion from RCT3 to RCT4. Mot. Ex. 1 at 47:13-22.

2

Allstate realized the issue with RCT4 in part because of reports from agents, who noticed the repeated issue when renewing their customers' policies. Mot. Ex. 1 at 64:13-20; *see also* Mot. Ex. 5 at 153:2-7. In response, around March 2019 the company implemented Project UIN, which was supposed to add back the deducted 288 square feet (or relevant multiplier, depending on how many garage spaces the insured had) to policies' TLA. *See* FAC ¶¶ 16, 23; Oppo. 10:10-13; Mot. Ex. 1 at 44:12-15, 47:4-5 ("[T]he goal of [Project UIN] [was] . . . [t]o re-establish the total finished living area to where it was prior to the conversion."). Project UIN applied to all California homeowners insurance plans that had built-in garages as of March 2019. Mot. Ex. 5 at 149:14-19 ("[T]he project went back and touched all those policies with a built-in garage" to add the deducted 288 square feet.); *see also* Oppo. 8:7-8 (citing Oppo. Ex. 4 ¶ 22).

Hilario alleges that Allstate has different explanations for Project UIN, including that a corporate representative believed the transition to RCT4 did not reduce the square footage but rather revealed that Allstate had previously failed to insure built-in garages at *all*. Mot. 4:13-19 (citing Mot. Ex. 5, Allstate Trial, 149:20-25). The exhibit does not seem to fully support this theory—it reveals more that the attorney believed the theory, questioned the witness, and confused the witness. *See* Mot. Ex. 5 at 149:4-153:19; *see also id.* at 155:19-156:24 (revealing that Allstate "maintain[ed] the records to reflect the finished living area for properties with built-in garages"). But it does show that Allstate and its agents encountered issues with the two fields in RCT4, *see* Mot. Ex. 5 at 14824-149:7, and that it implemented Project UIN to "fix the FLA field from the TLA field to re-add back in the 288 square feet for each built-in garage bay," *id.* at 148:12-14.

The problem with Project UIN, according to Hilario, is that it was applied "across the board" without confirming whether the underlying policies had already been adjusted. Mot. 11:26-12:2. For example, Hilario says that her insurance agent noticed soon after the transition to the RCT4 technology that Hilario's FLA had decreased, and so requested that Allstate increase the FLA. *See* Oppo. 9:20-10:2. Allstate processed the increase based on the agent's data and apparently inputted the new number as FLA, and then RCT4 "extrapolated" the TLA by adding

3

1    288 square feet.[1]  *Id.* 10:7-9.  At this point, under Hilario's theory, her square footage was

2    properly reflected in the FLA and TLA, and no additional changes needed to be made.  At least

3    one deposition of an Allstate employee noted that the computer system was not "smart enough . . .

4    to determine which policies had been touched by agents and which ones hadn't been touched. . . .

5    [T]hat's why the project touched everybody."  Mot. Ex. 5 at 99:15-23.

6       Hilario asserts that in cases where the insurance policy was manually corrected, which

7    subsequently triggered the software to process the FLA and add the 288 square feet for TLA,

8    Project UIN unfairly double counted the garage space.  Mot. 6:6-19.  And in 2019, Allstate

9    applied Project UIN to Hilario's policy and increased both the FLA and TLA by an additional 288

10   square feet.  *See* FAC ¶ 23-25.  Hilario allegedly paid an extra $141.00 for the 288 square foot

11   increase.  *Id.* ¶ 26.

12      Hilario says that Allstate knew that some "agents had noted that . . . the reduction of square

13   footage was not correct and had increased it themselves" but that the company had trouble

14   determining out which policies "had been manually corrected."  Mot. Ex. 1 66:21-24, 68:9-17.

15   "[W]e were not able to tell if agents had gone in manually and made the adjustment before the

16   project was implemented."  *Id.* 69:1-3.  And even where they could see that adjustments were

17   made to the square footage, they could not determine whether that was due to the RCT conversion

18   "or if it was because the customer had remodeled their home" or something else.  *Id.* 70:14-24.

19      Allstate's corporate representative testified that when the company figured out it had

20   undervalued homes and policies for a period of years—apparently from the transition to RCT4

21   until the implementation of Project UIN—the company "went ahead and made that correction" to

22   the square footage of the policies, and then "notified customers through a pre-renewal letter."

23   Mot. Ex. 5 at 146:7-19.

24      Hilario says that even if policy holders had the responsibility to correct square footage

---

[1] Allstate says the FLA number used by the agent was based on incorrect information, including publicly available data, and so the FLA was improperly increased by only 150 square feet, despite Allstate's initial deduction of 288 square feet through RCT4.  *Id.* 9:20-10:9.  But the parties' papers show that Allstate added 288 square feet after the agent added the 150 square feet, and then again after implementing Project UIN.

4

1  numbers, Project UIN was not properly communicated to the policy holders and so they could not
2  know what to check for.  Mot. 9:6-21, 10:9-11:4.

## II. Procedural Background

Hilario filed her initial complaint, [Dkt. No. 1], and Allstate moved to dismiss, [Dkt. No. 19], which I granted with leave to amend, [Dkt. No. 40].  Hilario filed her first amended complaint ("FAC") on January 22, 2021, [Dkt. No. 41], alleging negligence and breach of California's Unfair Competition Law ("UCL").  Allstate filed an answer on February 19, 2021, [Dkt. No. 44], and pre-certification discovery ensued.  Hilario filed this motion for class certification on July 1, 2022, and after briefing was completed, I held a hearing on November 16, 2022.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663-64 (9th Cir. 2022), *cert. denied sub nom. Starkist Co. v. Olean Wholesale Grocery*, --- S. Ct. ---, 2022 WL 16909174 (Nov. 14, 2022).  "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis,'" that the requirements of Rule 23 are met.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)).  "[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence."  *Olean*, 31 F.4th at 665.

A "plaintiff[] must make two showings" to certify its purported class.  *Olean*, 31 F.4th at 663.  "First, the plaintiffs must establish 'there are questions of law or fact in common to the class,' as well as demonstrate numerosity, typicality, and adequacy of representation."  *Id.* (quoting Fed. R. Civ. Proc. 23(a)).[2]  "Commonality requires the plaintiff to demonstrate that the

---

[2] Rule 23(a) provides:
> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> **(4)** the representative parties will fairly and adequately protect the interests of the class.

5

class members 'have suffered the same injury,'" and the "claims must depend upon a common contention." *Wal-Mart*, 564 U.S. at 349-50 (quoting *Falcon*, 457 U.S. at 157).

"Second, the plaintiffs must show that the class fits into one of three categories" as provided in Rule 23(b). *Olean*, 31 F.4th at 663. Hilario seeks certification under Rule 23(b)(2) and 23(b)(3), as well as 23(c)(4).

For 23(b)(2), a "class action may be maintained if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. Proc. 23(b)(2).

Under 23(b)(3), a class may be certified if "questions of law or fact common to class members predominate over the questions affecting only individual members, and [so] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* 23(b)(3). In deciding this, courts consider:
(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

*Id.*

Rule 23(c)(4) provides, "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. Proc. 23(c)(4).

The process of class-certification analysis "may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (internal quotation marks omitted). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

---

Fed. R. Civ. Proc. 23(a).

6

1  In considering a motion for class certification, the substantive allegations of the complaint
2  are accepted as true, but "the court need not accept conclusory or generic allegations regarding the
3  suitability of the litigation for resolution through class action." *Hanni v. Am. Airlines*, No. C-08-
4  00732-CW, 2010 WL 289297, at *8 (N.D. Cal. Jan. 15, 2010). The court may also "consider
5  supplemental evidentiary submissions of the parties." *Id*.

## DISCUSSION

### I. Proposed Class Definition

Hilario seeks certification of the following class: "All Allstate California policyholders from 2019 to the present with at least one built-in garage who paid premiums for homeowners or renters insurance to Allstate." Mot. 1:17-19. I agree with the defendants that the proposed class definition is overly broad, *see* Oppo. 30:8-31:22, for three reasons.

First, Hilario does not plead facts showing that policyholders with renters' insurance were subjected to the issues caused by Project UIN. As the defendants point out, renters' insurance is fundamentally different from homeowners insurance and is generally not based on square footage. Oppo. at 2 n.3. Hilario does not contest that. Also, some facts in the discovery materials show that Project UIN only applied to "the *homeowner* book of business." Mot. Ex. 1 at 33:22-23 (emphasis added).

Second, Hilario concedes that Project UIN did not negatively affect all holders of homeowners insurance policies during the relevant time period, but rather only those whose policies had already been adjusted. *See* Mot. 1:21-13 ("For some [policyholders] [Project UIN] worked, but for others, including Plaintiff, it did not."]; Oppo. 25:24-26; 30:17-23. Although Project UIN applied to polices that had not previously been adjusted, it is not clear how those holders could have a claim for negligence[3] or unfair business practices[4] if their garage square

---

[3] An element of negligence is damages. *See McMahon v. San Francisco Police Dep't*, No. 17-CV-00174-WHO, 2017 WL 4551506, at *4 (N.D. Cal. Oct. 12, 2017). *Even if* Allstate negligently implemented Project UIN or negligently communicated the changes, insureds whose policies were readjusted back to the proper level cannot show damages, because their garage space was not double counted in calculating their premiums.

[4] Hilario's UCL cause of action is grounded in allegations of "charg[ing] . . . inflated premium[s]," FAC ¶ 67, "double-counting the square footage of built-in garages," *id.* ¶ 70, "artificially

7

1   footage was not counted twice.

2   Third, Allstate points out that Project UIN applied to all policyholders with at least one built-in garage space *as of March 2019*. Oppo. 8:7-8 (citing Oppo. Ex. 4 ¶ 22); *see also* Mot. Ex. 5 at 85:10-15. Insureds who purchased policies after Project UIN was implemented—after March 2019—were not subject to the same conduct as Hilario or other purported class members because the agents (apparently) inputted the correct numbers the first time. Those policyholders did not suffer the injury at issue in this case.

For those reasons, I narrow the class definition to the following: "All Allstate California homeowners' insurance policyholders as of March 2019, who paid premiums and had at least one built-in garage, and whose garage square footage was counted twice in calculating insured square footage and premiums."

Allstate's remaining arguments concerning the class definition are addressed throughout the analysis, particularly in the commonality and predominance sections below.

## II.   Rule 23(a)

### A. Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a)(1). "As the Supreme Court has explained, this 'numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.'" *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 835 (9th Cir. 2022) (quoting *Gen. Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 330 (1980)). However, courts within the Ninth Circuit generally agree that numerosity is satisfied if the class includes forty or more members. *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605-06 (N.D. Cal. 2014); *In re Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012).

Hilario asserts her purported class consists of the 43,265 individuals that held policies to

---

increasing the square footage and premium charged to policyholders," *id.* ¶ 71, failure to disclose the "material fact" that individuals were charged "increased premium[s]," *id.* ¶ 74, and "charg[ing] the policyholder a higher premium for square footage that the policyholder did not even own," *id.* ¶ 76. None of these applied to individuals whose garages were not double counted and whose premiums were therefore not inflated, even if Project UIN applied to their policies.

8

1 which Project UIN applied. Mot. 17:16-17; *see also* Mot. Ex. 1 at 35-37 (confirming Project UIN
2 applied to the over 40,000 insured homes in California that had built-in garages). As discussed
3 and as Hilario concedes, not all of those properties were harmed by the project and so not all of
4 those policyholders are included in the proposed class. But Allstate estimated that the conversion
5 from RCT3 to RCT4 resulted in incorrect FLA numbers for at least 20,000 properties. Mot. Ex. 1
6 at 47:13-22. That means the remaining approximately 20,000 properties had correct FLA
7 numbers, likely due to manual adjustments made by their agents. But Allstate applied the Project
8 UIN 288 multiplier to increase the square footage of *all* properties with built-in garages and did
9 not exclude those properties that already had corrected FLA numbers. Each of those policyholders
10 is a potential class member. Even if the ultimate number is determined to be lower than 20,000, it
11 is certainly high enough to meet the numerosity requirement.

12 The defendants' remaining contentions about numerosity are that Hilario fails to show that
13 the inflated square footage resulted in higher premiums, Oppo. 26:1-10, and that none of her data
14 shows that any class member's square footage was "excessive," Oppo. 26:15-17. These questions
15 concern commonality and predominance, not numerosity, and are addressed below.

**B. Commonality**

17 "The commonality requirement of Rule 23(a)(2) requires plaintiffs seeking class
18 certification to show that their claims 'depend upon a common contention' that 'is capable of
19 classwide resolution—which means that determination of its truth or falsity will resolve an issue
20 that is central to the validity of each one of the claims in one stroke.'" *A. B.*, 30 F.4th at 839
21 (quoting *Wal-Mart*, 564 U.S. at 350). "In determining whether the 'common question'
22 prerequisite is met, a district court is limited to resolving whether the evidence establishes that a
23 common question is *capable* of class-wide resolution, not whether the evidence in fact establishes
24 that plaintiffs would win at trial. While such an analysis may 'entail some overlap with the merits
25 of the plaintiff's underlying claim,' the '[m]erits questions may be considered [only] to the extent
26 [] that they are relevant to determining whether the Rule 23 prerequisites for class certification are
27 satisfied.'" *Olean*, 31 F.4th at 666-67 (first quoting *Wal-Mart*, 564 U.S. at 351; then quoting
28 *Amgen*, 568 U.S. at 466; and then citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8

(9th Cir. 2011)).

"In order for the plaintiffs to carry their burden of proving that a common question predominates, they must show that the common question relates to a central issue in the plaintiffs' claim." *Id.* at 665 (citing *Wal-Mart*, 564 U.S. at 349-50). "Therefore, '[c]onsidering whether "questions of law or fact common to class members predominate" begins, of course, with the elements of the underlying cause of action.'" *Id.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).

Hilario identifies several pertinent questions of law and facts that will be determined on a common basis based on class-wide evidence and proof, including among others:

- Whether Allstate had or has a system-wide policy that TLA must include built-in garages, FLA must not, and built-in garages are always calculated at 288 square feet per garage bay. Mot. 18:3-8.
- "Whether Allstate created Project UIN to add the square footage for built-in garages for Insured Properties," "systematically applied" it to all properties, and "increased" FLA and TLA for each property "by a multiple of 288 square feet." *Id.* 18:13-14, 19; 19:1-2.
- "Whether Allstate had knowledge [that] there was a risk that Project UIN would . . . increase the [FLA and/or TLA] . . . by double counting built-in garage space" and whether it "had the ability to identify" properties that had already been adjusted before applying Project UIN. *Id.* 18:14-18.
- Whether Allstate's conduct constituted fraudulent business practices, *id.* 19:13-19, and whether its conduct was deceptive or unfair, *id.* 20:1-4.
- Whether Allstate owed a duty of care to class members, and whether it breached that duty by how it calculated and charged premiums. *Id.* 20:6-7.

Hilario's underlying causes of action are negligence and breach of California's UCL. The elements of a negligence claim in California are duty, breach, causation, and damages. *McMahon*, 2017 WL 4551506, at *4 (citing *Conroy v. Regents of Univ. of Cal.*, 45 Cal. 4th 1244 (2009)). And "[t]o state a UCL claim, a plaintiff must show either an (1) 'unlawful, unfair, or fraudulent business act or practice,' or (2) 'unfair, deceptive, untrue or misleading advertising.'" *Kemp v.*

10

*Wells Fargo Bank, N.A.*, No. 17-CV-01259-MEJ, 2017 WL 4805567, at *15 (N.D. Cal. Oct. 25, 2017) (quoting *Lippett v. Raymond James Fin. Servs.*, 340 F.3d 1033, 1043 (9th Cir. 2003)).

Whether Allstate breached a duty to insureds by implementing RCT4, failing to catch the reduction in garage space, failing to communicate the issue, applying the Project UIN solution to all policies including those previously adjusted, and failing to clearly communicate the fix, are common questions of law and fact "capable of class-wide resolution." *Olean*, 31 F.4th at 667. Whether any of that conduct constituted unlawful, unfair, or fraudulent business practices under the UCL is a common question of law related to central issues of the UCL claims. *See id.* at 665. The truth or falsity of many of these issues can resolve central issues for the negligence and the UCL claims, as required for commonality. *See A.B.*, 30 F.4th at 839. And, as presented at this stage of litigation, the evidence is "capable of resolving a common question on a class-wide basis." *Id.* at 668.

Allstate's argument against commonality does not deny that Project UIN and the increased square footage applied to all purported class members. Rather, Allstate says that "determin[ing] liability under Plaintiff's theory, *i.e.*, whether Allstate's record of square footage is overstated, would necessitate individual adjudication of the true size of each home, as well as [other unique considerations]." Oppo. 29:4-13. But at this stage, it is not clear that either cause of action requires establishing the "actual" square footage of any home owned by purported class members. The common questions of law do not necessarily require determining the best and most economically efficient price that each purported class member *should* have paid, had the parties had all information about square footage when calculating policies. Rather, the negligence and UCL claims depend on the "common contention" that Allstate applied the garage square footage increase even to policies whose square footage had already been adjusted, thus increasing premiums. *See A.B.*, 30 F.4th at 839. The veracity of this contention is capable of class-wide resolution and central to Hilario's claims. Indeed, the "common *answers*" about whether Allstate implemented this policy, and breached any duty or violated the UCL, will "drive the resolution of litigation" in this case. *Wal-Mart*, 564 US at 350.

Hilario's claims satisfy the commonality requirement.

11

**C. Typicality**

"To establish typicality, as required by Rule 23(a)(3), plaintiffs must show that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *A. B.*, 30 F.4th at 839 (quoting Fed. R. Civ. Proc. 23(a)(3)). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "Under the rule's permissive standards, representative claims are 'typical' if they are *reasonably co-extensive* with those of absent class members; they need not be substantially identical." *Amey v. Cinemark USA Inc.*, No. 13-CV-05669-WHO, 2018 WL 3956326, at *4 (N.D. Cal. Aug. 17, 2018) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)) (emphasis in *Amey*). "Unique defenses against a class representative 'counsel against class certification only where they threaten to become the focus of the litigation.'" *Id.* (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010)). And "[b]ecause the considerations underlying the two requirements overlap considerably, the Supreme Court has noted that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *A. B.*, 30 F.4th at 839 (quoting *Falcon*, 457 U.S. at 157 n.13).

Hilario contends that Allstate was negligent and engaged in unfair business practices based on the double counting of built-in garage square footage, as well as related conduct. Specifically, Hilario asserts that Allstate breached its duty of care—and in the process engaged in unfair business practices—by transitioning to a software that improperly deducted square footage, failing to catch the issue, failing to properly communicate with insureds when it discovered the issue, applying the "solution" across to board including to policies where a fix was already implemented and so double counting garage space, and not communicating with insureds about what the fix accomplished. Hilario asserts that this "same course of conduct" impacted her policy as well as the policies of thousands of other insureds in California. *See A.B.*, 30 F.4th at 839. According to Hilario, and as supported by discovery documents, this same course of conduct was "not unique" to her, *see id.*, but rather affected all purported class members in the same way and at the same

12

time—particularly the application of Project UIN, doubling of the garage square footage, receipt of oblique communications, and payment of increased premiums. Indeed, though not required for typicality, it seems Hilario's claims are "substantially identical" to those of the other purported class members. *See Amey*, 2018 WL 3956326, at *4.

Allstate argues that Hilario's claims are not typical because they require Allstate to assert unique defenses, including that Hilario's actual square footage is higher than the resulting premium would indicate in part because Hilario had post-build construction. Oppo. 27:11-28:2. But whether Hilario had unpermitted construction and whether her house's actual square footage was different from the insured square footage are not dispositive of the specific claims she brings in this case. Even if Hilario's policy should have reflected that the "true" square footage of her house was larger than what was being insured, that is a separate question from whether Allstate increased her premium because it double counted her garage space. And because it is a separate question, this possible defense to Hilario's claims does not "threaten to become the focus of the litigation." *Amey*, 2018 WL 3956326, at *4.

Hilario's claims satisfy the typicality requirement.

**D. Adequacy**

Rule 23(a)(4) requires that the named parties be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. Proc. 23(a)(4). To meet this requirement, the plaintiff must show that (1) the named plaintiff and her counsel do not have conflicts of interests with other class members, and (2) the name plaintiff and her counsel will prosecute the action vigorously on behalf of the class, which includes a showing that class counsel is competent and qualified. *See Hanlon*, 150 F.3d at 1020. Hilario meets these requirements.

A class representative is adequate where her "claim and the class claims are so interrelated that the interests of the Class Members will be fairly and adequately protected in their absence." *Gen. Tel. Cop. of Sw.*, 457 U.S. 147, 157 (1982). As explained, Hilario is typical of her class, and her individual claims are essentially identical to those she brings on behalf of the class. Allstate's arguments to the contrary go to typicality, not adequacy. *See* Oppo. 27:1-28:2. Hilario is an adequate class representative, and she has no conflicts of interest with other class members.

To determine whether class counsel is adequate, I look to: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. Proc. 23(g)(1)(A). Class counsel have dedicated a substantial amount of time and resources to the present case and intend to continue to do so. *See* Mot. Ex. 42, Prior Decl. ¶¶ 3-5. In addition, class counsel have previously litigated insurance cases and many class actions. *See* Mot. Ex. 42, Shane Decl. ¶ 9; Prior Decl. ¶ 7. Class counsel are competent and qualified, and have no conflicts of interest with any class members.

The adequacy requirements of Rule 23(a)(4) are met.

### III. Rule 23(b)

#### A. Rule 23(b)(3)

Certification under Rule 23(b)(3) requires finding:

> [T]hat the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. Proc. 23(b).

Much of Allstate's challenge to Hilario's class certification falls under the issue of predominance. "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Olean*, 31 F.4th at 664 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). "When individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Id.* at 668 (citing *Cordoba v. DIRECTV, LLC*, 942

14

F.3d 1259, 1277 (11th Cir. 2019)). An "individual question is one 'where members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson*, 577 U.S. at 453 (citation omitted).

In the present case, common questions predominate. Hilario's claims concern Allstate's alleged negligence and UCL breach stemming from its generalized application of a 288 square foot multiplier to all policies with built-in garages, regardless of whether individual policies had already been upwardly adjusted to account for the garages. Whether Allstate engaged in that conduct, including related questions about its communications, are questions of fact common to all proposed class members. Whether that conduct constituted negligence or a breach of UCL are questions of law common to all proposed class members. "[T]he same evidence will suffice" to answer these questions for each class member, because every alleged injury stems from the same course of conduct. *See id.* And as described below, any "individual issues" are minor or much less prevalent than these common contentions. *See Olean*, 31 F.4th at 664.

Allstate's counterarguments fall into three main categories and ultimately all are unpersuasive. First, Allstate asserts that Hilario cannot establish class-wide liability because publicly available square footage is not determinative of "actual" square footage.[5] But it is not clear that publicly available square footage information will be necessary to identify any class members. Allstate concedes that it knows which policies were affected by Project UIN. *See, e.g.*,

---

[5] Allstate frames this in part as an argument that the purported class is not "ascertainable." Oppo. 30:8-31:2. In 2017, and referring to ascertainability as "administrative feasibility," the Ninth Circuit declined to find that Rule 23 "impose[s] a freestanding administrative feasibility prerequisite to class certification." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017); *see also id.* at 1125 n.4 (noting the defendants referred to administrative feasibility as "ascertainability," a requirement the Ninth Circuit has not adopted, and explaining that those "types of alleged definitional deficiencies" are addressed "through analysis of Rule 23's enumerated requirements"). The *Briseno* panel also determined that the same concerns underlying an "ascertainability" requirement were addressed through the requirements in Rule 23(b)(3)(D), which requires a court to consider "the likely difficulties in managing a class action." *Id.* at 1126. For those reasons, I consider Allstate's ascertainability arguments as part of the Rule 23(b)(3) analysis.

Mot. Ex. 5 at 89:21-23 (Q: "So that's a very easy way to identify per policy who was subjected to project UIN?" A: "Correct."). Documents from discovery show that Allstate's internal databases have notes and flags that identify which policies Project UIN applied to. *Id.* at 86:2-90:24[6]; *see also id.* at 100:8-10 ("[T]he records show that everyone with a built-in garage[,] their square footage had changed, decreased by a factor of 288 square feet."); *id.* at 128:9-14. Though not all of these policyholders are class members, Allstate tracks square footage changes to all policies over time, *see* Mot. 12:23-25, and so can determine both which policies were affected by Project UIN and which policies had previously been adjusted so that Project UIN was redundant, without referring to public records. *See also* Mot. Ex. 5 at 104:7-9 ("When you run an audit you can determine that [the transition to RCT 4] is where the 288 square feet comes from."); Fed. R. Civ. Proc. 23(b)(3)(D) (requiring courts to assess the manageability of a proposed class). And also, Allstate's argument that these kinds of websites should not be used in this case is dubious: as Hilario points out, Allstate agents use public records—including Zillow and related websites—to write policies. *See* Mot. Ex. 5 at 308:21-24; Mot. Ex. 2 at 96:6-20; Mot. Ex 31 at 31:4-32:3.

Second, Allstate says it cannot track all square footage changes made to a policy within a year because all changes are combined into one number each year, on the policyholder's renewal date. Oppo. 19:10-18. It is not clear that Allstate would need more than the cumulative changes each year to determine which policies were affected by the alleged double counting. But more importantly, Allstate has access to that information—it says as much in the main declaration it relies on for its opposition. *See* Oppo. Ex. 4 ¶¶ 18-20 ("Both of these changes"—the decrease in Hilario's square footage due to the transition to RCT4 and the subsequent manual increase made by her agent—"are reflected in [the] underwriting materials and policy documents.").

Third, Allstate says individual inquiries into damages will predominate. Even if damages ultimately must be tried separately, this does not defeat predominance so long as "central issues in

---

[6] Q: "So can we agree that for every property that was subjected to project UIN they would include language in the underwriting file showing that the . . . total living area square footage was updated and the finished living area square footage was updated due to UIN 203019 total living area corrects?"
A: "Yes."
Mot. Ex. 1 at 89:13-20.

16

the action are common to the class." *Olean*, 31 F.4th at 668 (citing *Tyson Foods*, 577 U.S. at 453). According to Allstate, Hilario has no damages because the square footage on her insurance policy is less than the "actual" square footage of her home, and other purported class members' policies do not reflect the "actual" square footage of their homes for similar reasons, including unpermitted construction, elections for higher than minimum coverage, and input mistakes by agents. Allstate also says that no insureds can prove *any* damages because even policies that were "underinsured" after the transition to RCT4 and before the application of Project UIN still yielded full coverage beyond what the square footage would imply, for cases of complete loss. Oppo. at 7 n.8, 23:7-14; *see also* Mot. Ex. 5 at 146:21-147:18. But the alleged damages of each class member stem from being charged twice for the same square footage, as based on Allstate's calculations and premiums at the time. They do not stem from the comparison between what a class member actually paid in premiums and what they would have paid if Allstate charged the most economically efficient price it could have. And whether an insured was overcharged for premiums is a different question from whether they were sufficiently compensated for total losses. Therefore, this argument is unpersuasive, and I find that common questions predominate.

Hilario also establishes that "a class action is superior to other available methods for fairly and efficiently adjudicating" this case. Fed. R. Civ. Proc. 23(b)(3). Because the questions of law and fact are so similar for each plaintiff here, the allegations of wrongful conduct are so consistent and universal, and the relevant injuries occurred in California, the proposed class members' interests are best served by prosecuting this action together in this forum. *See id.* 23(b)(3)(A), (C). Additionally, it does not appear there is any other litigation concerning this controversy. *See id.* 23(b)(3)(B).

For those reasons, this class may be certified under Rule 23(b)(3).

### B. Rule 23(b)(2)

Hilario also seeks certification of her proposed class under Rule 23(b)(2), which provides that certification is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. Proc. 23(b)(2).

Allstate argues that certification is inappropriate under Rule 23(b)(2) because the primary relief that Hilario seeks is monetary, which is beyond incidental to declaratory or injunctive relief. Oppo. 31:24-32:21. Allstate also argues that Hilario does not show "a real and immediate threat of repeated injury in the future," that policyholders now receive more information about FLA and TLA, and that agents receive additional training on the RCT software and square footage determinations. *Id.*

"Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Ellis*, 657 F.3d at 986 (quoting *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001)). The Ninth Circuit has explained that although it "previously held that in 'Rule 23(b)(2) cases, monetary damage requests are generally allowable only if they are merely incidental to the litigation,'" that standard was "called into doubt" by the Supreme Court in *Wal-Mart*. *Id.* (quoting *Kanter v. Warner–Lambert Co.,* 265 F.3d 853, 860 (9th Cir. 2001)). Because Rule 23(b)(2) does not provide the same procedural protections to potential class members as afforded under Rule 23(b)(2), "[t]he absence of th[o]se protections in a class action predominantly for monetary damages violates due process." *Id.* (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).

Hilario's complaint seeks restitution and money damages for class members' alleged overpayment caused by double counted garage space in their square footage calculations. She also says that "Allstate has been charging and collecting inflated premiums from policyholders . . . for almost two years" but has "neither informed its policyholders . . . nor . . . reimbursed them." FAC ¶ 47. Hilario apparently seeks injunctive relief to stop Allstate from overcharging class members that still hold policies with the company. Allstate seems to represent that Project UIN has ended and the company has changed some of its practices, *see* Oppo. 32:25-33:5, but does not directly address whether it continues to charge purported class members for double counted garages. These are important questions that will likely be addressed as litigation progresses. But for now, because Hilario seeks money damages as a fundamental remedy in this case, and because she can

1  still receive her desired injunctive relief via certification under Rule 23(b)(3), I decline to certify
2  the class separately under Rule 23(b)(2).

### IV. Rule 23(c)(4)

In a brief paragraph at the end of her motion, Hilario seeks certification under Rule 23(c)(4) for any issues that can be resolved on a class-wide basis. "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. Proc. 23(c)(4). Because this class may be certified under Rule 23(b)(3), Hilario need not "isolate the common issues" in this case to "proceed with class treatment of these particular issues" under Rule 23(c)(4). *Cover v. Windsor Surry Co.*, No. 14-CV-05262-WHO, 2017 WL 9837932, at *9 (N.D. Cal. July 24, 2017) (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)). I decline to certify a class under this rule.

### CONCLUSION

Hilario's motion for class certification is GRANTED. A Case Management Conference is set at 2 p.m on January 10, 2023, during which the remaining trial calendar will be determined. The parties' Joint Case Management Statement, which should propose dates for the remaining events and the trial, should be filed on or before January 3, 2023.

**IT IS SO ORDERED.**

Dated: November 22, 2022



William H. Orrick
United States District Judge