**SHANE LAW**
David Shane (State Bar No. 109890)
1000 Drakes Landing Rd #200
Greenbrae, CA 94904-3027
Telephone: (414) 464-2020
dshane@shanelaw1.com

**HART McLAUGHLIN & ELDRIDGE LLC**
Brian Eldridge (State Bar No. 220822)
Steven Hart (pro hac vice)
One South Dearborn, Suite 1400
Chicago, Illinois 60603
Telephone: (312) 955-0545
beldridge@hmelegal.com
shart@hmelegal.com

*Attorneys for Plaintiff Tisha Hilario and the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TISHA HILARIO, individually and on behalf of a class of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY<br><br>Defendant. | No.  3:20-cv-05459-WHO<br><br>**PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT, SERVICE AWARD TO CLASS REPRESENTATIVE, AWARD OF ATTORNEYS' FEES, AND REIMBURSEMENT OF EXPENSES**<br><br>Hearing Date: December 2, 2025<br><br>Time: 2:00 p.m.<br><br>Judge: William H. Orrick |

Plaintiff, individually and on behalf of a class of all others similarly situated, by and through their counsel, respectfully request that this Court grant final approval of this settlement, the proposed service award to the Class Representative, and attorneys' fees and reimbursable expenses to Class Counsel. Plaintiff and Defendant shall be collectively referred to as "Parties."

MOTION FOR
FINAL APPROVAL OF
SETTLEMENT

### TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................ 1

II.    BACKGROUND .............................................................................................. 1

    A.    Case Overview ..................................................................................... 1

    B.    Plaintiff's Theory ................................................................................ 2

    C.    This Court's Certification Order was Affirmed by the Ninth Circuit ..... 3

    D.    Mediation and Resolution .................................................................... 3

    E.    Summary of Settlement Agreement ...................................................... 4

    F.    The Court Certified the Settlement Class and Granted Preliminary Approval ............................................................................................... 5

    G.    The Notice Plan Resulted in an Exceptionally High Percentage of Class Members Receiving Notice ................................................................... 5

    H.    Opt-Outs and Objections ...................................................................... 7

III.   THE SETTLEMENT SHOULD RECEIVE FINAL APPROVAL ..................... 7

    A.    The Class Representative and Class Counsel Have Adequately Represented the Class ........................................................................... 7

    B.    The Settlement was Negotiated at Arm's Length and is Presumed Fair 8

    C.    The Relief Provided to the Class is Adequate ....................................... 8

        1.    *The Strength Of The Plaintiff's Case* ................................................... 9

        2.    *The Risk, Expense, Complexity, and Likely Duration of Further Litigation* ................ 9

        3.    *The Risk Of Maintaining Class Action Status Through Trial* ................................... 10

        4.    *The Amount Offered In Settlement* ..................................................... 10

        5.    *The Extent of Discovery Completed and The Stage of Proceedings* ................. 11

        6.    *The Experience And View Of Counsel* ................................................ 11

        7.    *The Presence Of A Governmental Participant* .................................... 11

        8.    *The Reaction Of The Class Members To The Proposed Settlement* ................. 11

    D.    The Settlement Treats Class Members Equally Relative to Each Other ................................................................................................... 11

    E.    The Fairness, Adequacy, and Reasonableness of the Settlement is Supported by Comparable Cases ........................................................ 12

        1.    *Thieriot v. Celtic Ins. Co., 2011 WL 1522385 (N.D. Cal. 2011)* ............................ 12

        2.    *Yearby v. American Nat'l Ins. Co., 20-cv-09222-EMC (N.D. Cal. 2023)* ............... 12

3. *Miller v. Travel Guard Group, Inc., et al.*, 21-cv-09751-TLT (N.D. Cal. 2024)....... 14

4. *Stevenson v. Allstate Ins. Co.*, 15-cv-4788-YGR (N.D. Cal. 2024) ........................... 14

 **F. The Notice Satisfied Due Process and Rule 23 ...................................... 15**

 **G. The Distribution Plan ............................................................................... 16**

**IV. THE SERVICE AWARD SHOULD BE APPROVED ....................................... 16**

**V. THE FEE AWARD SHOULD BE APPROVED ................................................. 19**

**VI. REIMBURSEMENT OF EXPENSES SHOULD BE APPROVED .................. 23**

**VII. CONCLUSION................................................................................................... 23**

# TABLE OF AUTHORITIES

## CASES

*Boyd v. Bank of America Corp.*, 2014 WL 6473804 (C.D. Cal. Nov. 18, 2014) ........................................ 19

*Class Plaintiffs v. City of Seattle,* 955 F.2d 1268 (9th Cir.1992), *cert. denied.,* 506 U.S. 953, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992) .................................................................................................. 7

*Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998) ...................................................................................... 16

*Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, (1983) .................................................................. 20

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011.) .............................................. 21

*In re Heritage Bond Litig.*, 2005 WL 1594389 (C.D. Cal. June 10, 2005) ................................................ 20

*In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730 (N.D. Cal. 2015) .................................... 14

*In re Omnivision Techs., Inc.*, 559 F.Supp.2d 1036 (N.D. Cal. Jan. 8, 2008) ........................................ 19

*In re Pacific Enters. Sec. Litig.,* 47 F.3d 373 (9th Cir.1995) .............................................................. 7, 20

*In re Stable Rd. Acquisition Corp.*, 2024 WL 3643393 (C.D. Cal. Apr. 23, 2024) ................................ 20

*In re Toys R Us-Delaware, Inc. — Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438 (C.D. Cal. 2014) ........................................................................................................ 8

*In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993 (N.D. Cal. 2015) .............................. 22

*In re Washington Public Power Supply System Securities Litig.*, 19 F.3d 1291 (9th Cir. 1994)............ 19

*In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F.Supp.3d 508 (N.D. Cal. 2020), *aff'd* 845 F.App'x 563 (9th Cir. 2021) ............................................................................................... 17

*Lewis v. U.S.*, 144 F.3d 1220 (9th Cir. 1998) .......................................................................................... 7

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir.1998) .................................................. 9, 19, 20

*Marshall v. Northrop Grumman Corp.*, 2020 WL 5668935 (C.D. Cal. Sept. 18, 2020) ................. 18, 19

*Miller v. Travel Guard Group, Inc.*, et al., 21-cv-09751-TLT (N.D. Cal. 2024) .................................. 14, 23

*Mostajo v. Nationwide Mut. Ins. Co.*, 2023 WL 2918657 (E.D. Cal. Apr. 12, 2023) ............................ 18

*Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 2009 WL 9200391 (C.D. Cal. June 24, 2009) ............................................................................................................... 19

*National Rural Telecommunications Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523................................. 8

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) ................................................. 8, 16

*Romero v. Producers Dairy Foods, Inc.*, 2007 WL 3492841 (E.D. Cal. Nov. 14, 2007) .......................... 19

*Ross v. U.S. Bank Nat. Ass'n*, 2010 WL 3833922 (N.D. Cal. Sept. 29, 2010).......................................... 18

*Stanton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)............................................................................... 16

Stevenson v. Allstate Ins. Co., 15-cv-4788-YGR (N.D. Cal. 2024) .......................................... 14, 15, 23

*Thieriot v. Celtic Ins. Co.*, 2011 WL 1522385 (N.D. Cal. Apr. 21, 2011)............................ 12, 19, 20, 22

*Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir.2002) ................................................................... 20

*Wilson v. Tesla, Inc.*, 2019 WL 2929988 (N.D. Cal. 2019) ...................................................................... 11

Yearby v. American Nat'l Ins. Co., 20-cv-09222-EMC (N.D. Cal. 2023)............................... 12, 13, 22

## STATUTES

28 U.S.C. § 1715....................................................................................................................................... 7

California Business and Professions Code § 17200 ........................................................ 12, 14

California Insurance Code § 10199 ................................................................................. 12

**OTHER AUTHORITIES**

5 Moore Federal Practice, § 23.85 (Matthew Bender 3d ed.) ........................................ 7

Newberg on Class Actions § 14.6 (4th ed.2007) ........................................................... 19

**RULES**

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................................ 15

Fed. R. Civ. P. 23(e)(1)(B) ............................................................................................ 15

Fed. R. Civ. P. 23(f) ........................................................................................................ 1

Fed. R. Civ. P. 30(b)(6) .................................................................................................. 2

## I.   __INTRODUCTION__

In this class action lawsuit, Plaintiff alleges that she and a certified class were charged excessive homeowners' insurance premiums due to Allstate "double counting" built-in garage square footage in calculating insurance premiums. Plaintiff's lawsuit was filed more than five years ago, on August 6, 2020. (Doc. 1.) After years of intensive litigation with attorney time exceeding 2250 hours, the certification of a class by this Honorable Court, and the subsequent affirmance by the Ninth Circuit after Allstate's Rule 23(f) Petition, the Parties reached a resolution that provides a significant and material benefit to the Class. As discussed below, the Settlement would provide class members with more than 86% of their potential maximum recovery, with the average award to class members being almost $1,000.00 ($993.28.).

On September 4, 2025, this Court granted preliminarily approval of the Settlement. (Doc. 140.) Notice was timely issued. No objections have been filed and only one class member opted to be excluded from the Class. The Parties now respectfully move this Court for final approval of the Settlement, the Service Award, the Fee Award, and reimbursement of expenses. A proposed order granting final approval is attached as Exhibit A.

## II.   __BACKGROUND__

The factual and procedural background of this case is set forth at length in Plaintiff's Amended Unopposed Motion for Preliminary Settlement Approval and for Certification of the Proposed Settlement Class. (Doc. 139.) A summary follows below.

### A. Case Overview

On August 6, 2020, Plaintiff filed a Class Action Complaint challenging Allstate's method for calculating a home's square footage. (Doc. 1.) In particular, Plaintiff alleged that for a period of time Allstate was "double-counting" built-in garage space in calculating a home's square footage, which had the effect of artificially and unfairly increasing its California insureds' homeowners' insurance premiums.

The Parties engaged in extensive discovery relating to their respective claims and defenses, both individually and as to the putative class. In addition to written discovery and the production of documents by both sides, the Parties took eleven (11) depositions, including

1    the deposition of Plaintiff and Class Representative, Tisha Hilario, the deposition of Plaintiff's

2    expert witness, Kathryn McNally, the deposition of Plaintiff's consultant and former Allstate

3    agent, Steve Mahoney, numerous depositions of current and former employees of Allstate,

4    and the deposition of Allstate's Rule 30(b)(6) designee.

5             **B.  Plaintiff's Theory**

6             Through Plaintiff's discovery efforts, together with a fact-intensive and complicated

7    analysis, Plaintiff determined the nature and scope of Allstate's alleged wrongdoing. To do so,

8    Class Counsel and their consultant had to work through data produced by Allstate on

9    thousands of insurance policies and decipher how, when, and why policy changes were

10   implemented over the course of four years. This time-intensive effort was critical to

11   determining exactly what happened here.

12            The problem stemmed from changes to Allstate's computer systems used for

13   calculating square footage. For many years the application for insurance completed by agents

14   had only one field for an agent to input a home's square footage and then a separate field for

15   an agent to input the number of garage bays.[1] For instance, if a home's square footage was

16   1000 square feet and it had a one-car garage, the total square footage would be calculated as

17   1288 square feet. The information was collectively used to calculate the size of an insured's

18   home which, in turn, is one of the elements used to determine the amount of a homeowners'

19   premium.

20            In 2017, Allstate implemented a computer program referred to as RCT-4, which

21   inadvertently reduced the total square footage for certain California homes with built in

22   garages. As a result, using the above example, if the total square footage of a home including

23   a garage was 1288 square feet, RCT-4 mistakenly converted the total square footage to 1000

24   square feet. When Allstate realized the impact of RCT-4, it implemented Project UIN 203019

25   ("Project UIN") to fix it. The intent of Project UIN was to increase the square footage back

26   to where it was by adding back the built-in garage space mistakenly removed by RCT-4. Project

27

28            [1] At all relevant times, built-in garages have been calculated by Allstate as 288 square feet per bay, meaning a two-car garage would be calculated as 576 square feet, a three-car garage as 864 square feet, and so on.

UIN worked as intended for many California homeowners' insurance policies, but not for all.

During the interim period between RCT-4 and Project UIN, some insurance agents or homeowners, presumably seeing the incorrect decrease in square footage, proactively adjusted the square footage upwards. For those whose square footage was adjusted during this interim period, the effect of Project UIN was to double-count the square footage of built-in garages. Furthering the above example, if the total square footage of a home including a single-car garage was 1288 square feet, and RCT-4 mistakenly reduced the square footage by one garage space (288 square feet), if an agent proactively increased the square footage back to 1288 during the interim period before Project UIN was implemented, the effect of Project UIN was to add *another* 288 square feet thus incorrectly providing that the home has 1576 square feet, instead of 1288 square feet.

Boiled down, Plaintiff's essential theory is that Project UIN was overly applied and that Allstate knowingly or negligently disregarded the fact that many policies had already been adjusted to account for the error created by RCT-4. This, according to Plaintiff, caused thousands of Allstate homeowners' insureds to pay inflated premiums.

### C. This Court's Certification Order was Affirmed by the Ninth Circuit

On November 22, 2022, this Court granted Plaintiff's motion for class certification (in part) and entered an Order Certifying Class. (Doc. 92.) On February 23, 2023, the Ninth Circuit granted Allstate's Rule 23(f) Petition for permission to appeal this Court's order granting class certification. Ultimately, after briefing and oral argument, on February 14, 2024, the Ninth Circuit issued an order affirming this Court's certification order.

### D. Mediation and Resolution

The Parties subsequently agreed to a private mediation, which was held on June 5, 2024. The mediation lasted much of the day and did not resolve the case. Over the next several months, however, the Parties continued to engage in negotiations through counsel. Pursuant to the request of the Parties, on October 24, 2024, the ADR Program Case Administrator for the United States District Court for the Northern District of California, assigned a mediator under the ADR Local Rules. Mediator Stephen M. Liacouras was assigned to this matter. On

December 12, 2024, after a full-day in-person mediation in San Francisco with Mediator Liacouras, the Parties reached a settlement in principle.

### E. Summary of Settlement Agreement

The Settlement Agreement requires Allstate to fund a total of $4,000,000.00 in exchange for a release of all claims that have been or could have been raised in this lawsuit. Out of that settlement fund, the Settlement Agreement includes: (i) proposed awards to class members; (ii) a service award to Tisha Hilario, as the Class Representative; and (iii) payment of attorneys' fees and expenses to Class Counsel.

After accounting for the proposed Service Award, Fee Award, payment of administrative costs, and reimbursement of costs and expenses, the balance available to the class under the Settlement Agreement is $2,498,960.03, which is 86.09% of the potential maximum damages.[2] Consequently, pursuant to the Settlement Agreement, each class member is to receive 86.09% of their potential damages.

As part of the settlement process, 2517 Class Members (now 2516 Class Members) whose built-in garage space was potentially double-counted as a result of Project UIN were identified. The Motion for Preliminary Approval detailed the process by which the settlement award for each class member was calculated. (Doc. 139 at pp. 6-9). In summary, the "total premium impact" for each Class Member was determined based upon the number of garage bays and the number of days during the class period the dwelling was insured by Allstate. Importantly, the calculation of each Class Member's award was based upon the same factors and application of the same formula.

The average settlement award across all Class Members is $993.28. The range of awards among Class Members is $20.00 to $4,248.70.[3] Out of proposed settlement awards: 98.5%

---

[2] The dollar figure and percentage have been adjusted upward since preliminary approval because the settlement funds for the excluded Class Member will be reallocated among the Class.

[3] In applying the formula (i.e., awarding approx. 86.09% of the potential impact) to the (now) 2516 Class Members, it was determined that there were twenty (20) settlement awards that would be less than $20.00, the lowest of which is $0.91. For all such awards, the Parties propose an upward adjustment for these twenty (20) class members to $20.00.

(2478) exceed $50; 97.4% (2451) exceed $100; and 53.7% (1351) exceed $1000. Also notable is that seventeen (17) awards exceed $2000; twelve (12) exceed $3000; and seven (7) exceed $4000.

       In granting Plaintiff's motion for preliminary approval, this Court found that the settlement amounts paid to Class Members provide "a concrete benefit, while also discounting for the risk that no relief would be achieved if litigation continued." (Doc. 140 at ¶ 10.)

### F. The Court Certified the Settlement Class and Granted Preliminary Approval

       On September 4, 2025, this Court granted Plaintiffs' Unopposed Motion for Preliminary Approval and for Certification of the Proposed Settlement Class. (Doc. 140.) At the request of the Parties, the Court amended the class definition as follows:

> All California homeowners policyholders of Allstate where (a) Allstate's internal records reflect the home to have a built-in garage; (b) Allstate included the policy in its corrective action process called Project UIN 203019 ("Project UIN"); and (c) Project UIN increased the square footage of the home in Allstate's internal records to a level that reflects actual or potential double counting of garage space.

(Doc. 140 at ¶ 3.)

       The Court approved the Class Notice and the Notice Plan, and further ordered that Class Notice be posted and issued within 30 days of its order, or by October 4, 2025. (*Id.* at ¶¶ 6-8, 14.)

### G. The Notice Plan Resulted in an Exceptionally High Percentage of Class Members Receiving Notice

      The Settlement Administrator, Angeion Group, complied with the court-approved Notice Plan. On September 26, 2025, the Class Notice was mailed to the 2517 Class Members. (Ex. B, Angeion Decl., at ¶ 4.) Addresses for Class Members were first determined from Allstate's records (as all Class Members are current or former Allstate insureds), and were then

1     updated using utilizing United States Postal Services National Change of Address Database.

2     *Id.* at ¶ 5.

3         At the same time, on September 25, 2025, the Settlement Administrator established the

4     following website devoted to this Settlement: www.HilarioSettlement.com ("Settlement

5     Website"). *Id.* at ¶ 7. The Settlement Website contains general information about the

6     Settlement, including answers to frequently asked questions, important dates and deadlines

7     pertinent to this matter, and copies of important documents. Visitors to the Settlement

8     Website can download: (1) the Notice, (2) the Preliminary Approval Order, and (3) the

9     Settlement Agreement, among other case documents. Id. The Settlement Website also has a

10     "Contact Us" page which Class Members can use to submit questions regarding the

11     Settlement, or they can send an email to a dedicated address: info@HilarioSettlement.com. *Id.*

12         On the same date, September 25, 2025, the Settlement Administrator also established

13     the following toll-free line dedicated to this case: 1- 833-773-4117. *Id.* at ¶ 9. The toll-free line

14     utilizes an interactive voice response ("IVR") system to provide Class Members with responses

15     to frequently asked questions and information about filing a claim and important deadlines.

16     *Id.* The toll-free line is accessible 24 hours a day, 7 days a week. *Id.*

17         Based upon the date notice was issued and posted, the deadline for opt outs and

18     objections was calculated as November 10, 2025. *See* Doc. 140 at ¶ 14 (deadline is 45 days after

19     posting and mailing of notice). Through November 10, 2025, the Settlement Administrator

20     received 48 Notices returned by the USPS as undeliverable. *Id.* at ¶ 6. For those notices, the

21     Settlement Administrator conducted address verification searches (commonly referred to as

22     "skip traces") in an attempt to locate updated address information. *Id.* On October 27, 2025,

23     the Settlement Administrator remailed 40 Notices to updated addresses. *Id.* As of November

24     10, 2025, out of the 40 remailed Notices, the Settlement Administrator has not received any

25     returned as undeliverable. *Id.* On November 3, 2025, the Settlement Administrator conducted

26     another address verification in an attempt to locate updated address information and on

27     November 4, 2025, remailed one Notice to the updated address identified. *Id.*

28         In terms of the Settlement Website, as of November 10, 2025, it has had approximately

1  4,411 page views and approximately 2,448 sessions, which represents the number of individual

2  sessions initiated by all users on the website. *Id.* at ¶ 9. As of November 10, 2025, the toll-free

3  line has received approximately 13 calls, totaling 46 minutes. *Id.* at ¶ 10.

4      Based upon this data, it is presumed that 2510 out of 2517 Notices were received

5  through the mail by Class Members, a rate of 99.7%. *See Lewis v. U.S.*, 144 F.3d 1220, 1222

6  (9th Cir. 1998) ("mailbox rule"). The traffic on the Settlement Website and calls to the toll-

7  free line also indicate meaningful engagement on the part of the Class. Class counsel has also

8  received and responded to all telephone and email inquiries. (Ex. C, Eldridge Decl., at ¶ 5.)

9      Additionally, the Settlement Administrator timely issued "CAFA Notice" pursuant to

10  28 U.S.C. § 1715. (Ex. D, CAFA Notice.)

11      **H. Opt-Outs and Objections**

12      As of this filing, only one class member opted to be excluded from the Class. (Ex. B,

13  Angeion Decl., at ¶ 11.) Per the Class Notice, any objections to the Settlement were to be

14  mailed to the Court. As of this filing, no objections have been filed on the Court's docket. Ex.

15  C, Eldridge Decl., at ¶ 5.) The absence of any objections and the fact that only one Class

16  Member opted demonstrates strong support for this Settlement.

17      **III.    THE SETTLEMENT SHOULD RECEIVE FINAL APPROVAL**

18      To grant final approval of a class action settlement, the court must find that the

19  settlement is fair, reasonable, and adequate. 5 Moore Federal Practice, § 23.85 (Matthew Bender

20  3d ed.) (citing *In re Pacific Enters. Sec. Litig.,* 47 F.3d 373, 377 (9th Cir.1995) and *Class Plaintiffs v.*

21  *City of Seattle,* 955 F.2d 1268, 1276 (9th Cir.1992), *cert. denied.,* 506 U.S. 953, 113 S.Ct. 408, 121

22  L.Ed.2d 333 (1992)). The relevant considerations in determining whether a settlement is fair,

23  reasonable, and adequate are set forth in Rule 23(e)(2).

24      **A. The Class Representative and Class Counsel Have Adequately**

25          **Represented the Class**

26      Ms. Hilario's efforts and engagement in this case are detailed below in connection with

27  the proposed Service Award. In brief, Ms. Hilario is the lone class representative, she actively

28  contributed to all stages of the case, sat for a deposition, had her home inspected multiple

times, and attended and participated in the full day mediation that led to resolution. She has adequately represented the Class.

Class Counsel has also adequately represented the Class. They have dedicated more than 2250 hours in prosecuting this case, with no guarantee of a recovery. The result that was achieved—where Class Members will receive 86.09% of their potential damages—demonstrates that Class Counsel well-represented the Class.

### B. The Settlement was Negotiated at Arm's Length and is Presumed Fair

The settlement was reached after extensive negotiations over the course of many months assisted by an accomplished and well-regarded mediator, the Ninth Circuit's Chief Mediator, Stephen M. Liacouras. Settlement came after years of litigation, after a class was certified and then affirmed on appeal, and at a point the Parties were fully aware of their respective strengths and weaknesses and the risks of ongoing litigation. The attorneys involved in settling this case have extensive experience in complex cases, including class actions, and by and through their signatures on this motion hereby attest to the fairness and reasonableness of this settlement. As this Court found in granting preliminary approval, "the proposed Settlement Agreement was arrived at by arm's length negotiations between experienced counsel." (Doc. 140 at ¶ 5.)

A settlement following sufficient discovery and an arms-length negotiation is generally presumed to be fair. *In re Toys R Us-Delaware, Inc. — Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 450 (C.D. Cal. 2014), citing *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009); *National Rural Telecommunications Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair.") Such is the case here.

### C. The Relief Provided to the Class is Adequate

In evaluating the fairness, adequacy, and reasonableness of a settlement, the Court is to consider the following factors:

(1) the strength of the plaintiff's case;
(2) the risk, expense, complexity, and likely duration of further litigation;
(3) the risk of maintaining class action status throughout the trial;

(4) the amount offered in settlement;

(5) the extent of discovery completed and the stage of the proceedings;

(6) the experience and view of counsel;

(7) the presence of a governmental participant; and

(8) the reaction of the class members to the proposed settlement.

*Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1242 (9th Cir.1998).

### 1. *The Strength Of The Plaintiff's Case*

Plaintiff's case is fundamentally strong from the standpoint that certain Allstate insureds' built-in garages in California may have been double counted for purposes of calculating square footage. However, as Allstate would contend if this case moved forward, there is complexity in identifying exactly whose built-in garage was double counted. In particular, among Allstate's defenses was that "there is no class-wide method [to calculate the premium impact, if any,] because there is no linear or uniform scale between square footage and premium; rather, it varies among homeowners." (Doc. 77 at 22.) Additionally, at both the trial court level and on appeal to the Seventh Circuit, Allstate challenged whether Ms. Hilario was injured and met the typicality requirement under Rule 23(a).

Through settling the case, Plaintiff was not only able to ensure a recovery, but was able to attain monetary relief for Class Members at 86.09% of the full amount of potential damages. Additionally, the Settlement captured all those whose garage space was both actually and *potentially* double counted. In that regard, the Settlement likely brought in more Class Members than could have been achieved through continued litigation.

### 2. *The Risk, Expense, Complexity, and Likely Duration of Further Litigation*

There was risk if this case were to proceed through summary judgment, trial, and appeal. Had this case not resolved, Allstate would move for summary judgment based on its argument that the Class Representative, Ms. Hilario was not over-insured because the actual square footage of her home was at all times higher than the square footage listed on her Allstate policy. If Allstate was successful in moving for summary judgment against Ms. Hilario that could have been dispositive of the entire case. If Plaintiff survived summary judgment, there would be inherent risks of trial and appeal, together with the time and expense that would

involve. Based on the experience of Class Counsel, it might have taken another 2-3 years (though appeal) to reach a final judgment. And, of course, because there are no guarantees in litigation, continuing to pursue this case could have resulted in no recovery for the Class.

Resolving this case now—where the value of the settlement offer is very close to the potential recovery at trial—benefits the Class as a whole. Had the settlement offer been only a small fraction of the Class Members' potential recovery, it may well have been worth the risk. However, given the recovery for the Class Members provided through this Settlement, there is no sense in taking that risk. Said differently, Class Counsel could not in good conscience reject a settlement in favor of pursuing a slightly higher, albeit uncertain, recovery.

### 3. The Risk Of Maintaining Class Action Status Through Trial

As stated above, if the case did not resolve Allstate would be moving for summary judgment on Ms. Hilario's claims. Because Ms. Hilario is the lone Class Representative, if summary judgment were granted than the entire action could have been dismissed, eliminating all claims for all Class Members.  It is also notable that Allstate had success in getting the Ninth Circuit to grant its Rule 23(f) petition. Such petitions are very rarely granted and, when they are, a district court's ruling is often reversed. There is little doubt that Allstate would continue its efforts to decertify the Class had the case not resolved.

### 4. The Amount Offered In Settlement

The full amount to be funded pursuant to this common fund settlement is $4,000,000. Even after accounting for attorneys' fees of one-third of the common fund ($1,333,333.33), a service award of $20,000.00, and expenses totaling $168,604.72, the Class is still left with $2,498,960.03. Most important is that each Class Member would receive 86.09% of the potential maximum damages.

As discussed above, the average distribution to Class Members is $993.28, and more than 53% of Class Members (1,351) are due to receive at least $1,000. For those few Class Members who were minimally injured (because they were only insured for a matter of days during the relevant time period), the Settlement provides an upward adjustment and minimum settlement award of $20.00.

1    Plaintiff submits that this is an outstanding resolution for the Class.

2    *5.  The Extent of Discovery Completed and The Stage of Proceedings*

3    The Settlement was achieved after more than five years of litigation and thousands of

4    hours of work. The Parties had completed fact discovery, which included the production and

5    review of thousands of documents, a comprehensive analysis of Allstate's data, more than 10

6    depositions, extensive briefing on class certification at both the trial court and appellate court

7    levels, and months of arms-length negotiation. Put simply, the Parties had intimate knowledge

8    concerning the strengths and weaknesses of the respective claims and defenses and were well

9    situated to meaningfully evaluate the merits of resolution.

10    *6.  The Experience And View Of Counsel*

11    As was demonstrated at the class certification stage, Class Counsel has significant

12    experience with class action litigation. (Doc. 74-43.) In granting preliminary approval, the

13    Court further recognized that counsel for the Parties "have adequate knowledge concerning

14    the alleged damages sustained by the Class and well-informed on the basis of discovery." (Doc.

15    140 at ¶ 10.) Based upon their experience and assessment of this case, Class Counsel firmly

16    believes that this Settlement provides an excellent result to the members of the Class and is in

17    the best interests of the Class. (Ex. C, Eldridge Decl., at ¶ 4; Ex. E, Shane Decl. at ¶ 4.)

18    *7.  The Presence Of A Governmental Participant*

19    There are no government participants in this case or in the Settlement.

20    *8.  The Reaction Of The Class Members To The Proposed Settlement*

21    Based on the data set forth above, this Settlement has been well received by Class

22    Members. Only one Class Member asked to be excluded from the Settlement and no Class

23    Members have objected to any of the proposed terms. The favorable reaction from Class

24    Members creates a "strong presumption" for approval. *Wilson v. Tesla, Inc.*, 2019 WL 2929988

25    at *9 (N.D. Cal. 2019).

26    **D. The Settlement Treats Class Members Equally Relative to Each Other**

27    As demonstrated at the preliminary approval stage, Class Member awards were

28    determined based upon a series of factors, including each Class Member's "(a) number of

built-in garage bays; (b) the location of the insured property; (c) the length of time each Class Member paid an allegedly excess premium; and (d) the premium charged." (Doc. 140 at ¶ 10.) These factors and the same formula were applied consistently to all Class Members to determine individual awards.

### E. The Fairness, Adequacy, and Reasonableness of the Settlement is Supported by Comparable Cases

Comparable cases from this jurisdiction — *i.e.*, those involving insurance disputes and common fund settlements — support a finding that the Settlement is fair, adequate, and reasonable.

#### 1. *Thieriot v. Celtic Ins. Co., 2011 WL 1522385 (N.D. Cal. 2011)*

In *Thieriot*, the plaintiff class alleged that Celtic Insurance Company violated California Business and Professions Code § 17200 and California Insurance Code § 10199 by increasing premiums without giving the requisite notice. *Id.* at *1. The case settled for a common fund of $1,375,000. *Id.* at *2. Out of that amount, $806,463 was paid to class members. *Id.* Class counsel's petition for fees for one-third of the settlement amount, $458,333, was approved. *Id.* at 6. Notably, class counsel's approved fees were based on a 1.9 multiplier of their lodestar. *Id.* at 7. A $25,000 incentive award to the class representative was also approved. *Id.* at 8. As here, there were no objections to the settlement after notice.

Resolution of the present case is comparable to *Thieriot*. In both cases, the plaintiffs, on behalf of a class of insureds, allege that an insurance company violated the UCL, which resulted in class members paying excess premiums. Both cases settled for a common fund. In *Thieriot,* there were only 390 class members, so the average award per class member was $2,067.85. Here, there are 2516 and the average award per class member is $993.28. In both *Thieriot* and here, class counsel sought fees in the amount of one-third of the common fund. Whereas a 1.9 multiplier was approved in *Thieriot*, here class counsel does not seek a multiplier. In *Thieriot,* an incentive award of $25,000 (or 1.8% of the total settlement fund was approved). Here, Plaintiff seeks an incentive award of $20,000 (or 0.5% of the total settlement fund).

#### 2. *Yearby v. American Nat'l Ins. Co., 20-cv-09222-EMC (N.D. Cal. 2023)*

In *Yearby*, the plaintiff class alleged that American National Insurance Company incorrectly calculated "cost of insurance rates." (Ex. F, *Yearby* Motion for Final Approval, at 2-3.) The case settled for a common fund of $4,993,565.62, as well as a non-monetary benefit valued at $362,289.00. *Id.* at 6-7. Out of that amount, approximately $3,561,565.62 was paid to approximately 3000 class members. *Id.* Class counsel was awarded fees of $1,250,000, which amounted to 23.3% of the total settlement value. (Ex. G, Final Approval Order, at ¶ 2.) Notably, the settlement was achieved before any oral discovery had been conducted and before class certification was briefed. (Ex. F, Motion for Final Approval, at 3-4.) An incentive award to the class representative in the amount of $20,000 was also approved. (Ex. G, Final Approval Order, at ¶ 6.)

Resolution of the present case is comparable to *Yearby*. In both cases, the plaintiffs alleged excess charges by an insurance company. Both cases settled for a common fund. In *Yearby,* there were approximately 3000 class members and the average award per class member was approximately $1,160.[4] Here, there are 2516 and the average award per class member is $993.28. In *Yearby*, the plaintiff indicated that that the gross settlement represented 88% of the alleged overcharges, but that percentage was calculated *before* attorneys' fees, costs, and the incentive award were applied. Here, the class will receive more than 86% of their potential damages *after* accounting for fees, costs, and the incentive award. While the attorneys' fees sought and awarded in *Yearby* were less (by percentage and amount) than those sought by Class Counsel here, in *Yearby* the case settled within about 2 ½ years of filing, the parties had not conducted any oral discovery, and class certification had not been briefed or decided. Here, this case was filed more than five years ago, the parties engaged in extensive discovery over the course of years, and class certification was briefed and decided both in this Court and in the Ninth Circuit. In *Yearby*, the class representative was awarded an incentive award of $20,000. Plaintiff proposes the same incentive award here.

---

[4] While not explicitly addressed, this was calculated by taking the gross settlement fund, deducting attorneys' fees, reimbursable expenses, administrative costs, and the incentive award, and then dividing by 3000 class members.

*3.  Miller v. Travel Guard Group, Inc., et al., 21-cv-09751-TLT (N.D. Cal. 2024)*

In *Miller*, the plaintiff class alleged that Travel Guard Group, Inc, along with certain insurance companies, violated California Business and Professions Code § 17200 and California Insurance Code § 10199 by unlawfully, unfairly, and deceptively requiring consumers to pay a fee for "non-insurance assistance services" on top of the authorized premium. *Miller v. Travel Guard*, 2024 WL 534115 at *7. The case settled for a common fund of $23,997,500. *Id.* at *1. Out of that amount, $15,998,914.60 was paid to class members. (Ex. H, *Miller* Order Granting Final Approval, at 3.) Class counsel's petition for fees for 30% of the settlement amount, $7,199,250 was approved. *Id.* at 11-13. Notably, class counsel's approved fees were based on a 1.46 multiplier of their lodestar. *Id.* at 12. A $5000 incentive award to each of the three class representatives, for a total of $15,000, was also approved. *Id.* at 14.

Resolution of the present case is comparable to *Miller*. In both cases, the plaintiffs, on behalf of a class of insureds, allege that the defendants violated the UCL, which resulted in class members paying excess amounts. Both cases settled for a common fund. In *Miller,* the average award per class member was $64.89. *Id.* at 3. Here, the average award is much higher, $993.28. Class counsel's attorneys' fee award in *Miller* was 30% of the total settlement fund, whereas here, Plaintiff's counsel is seeking one-third. However, the gross settlement fund in *Miller* was almost six times the amount here[5] and a 1.46 multiplier was used. The total class representative incentive award in *Miller* ($15,000) does not differ substantially from the proposed incentive award here of $20,000.

*4.  Stevenson v. Allstate Ins. Co., 15-cv-4788-YGR (N.D. Cal. 2024)*

In *Stevenson*, the plaintiff class alleged that Allstate violated California Business and Professions Code § 17200, among other laws, in formulating rate factors of auto insurance. (Ex. I, *Stevenson* Order Granting Final Approval, at 2.) The case settled for a common fund of

---

[5] With larger common fund or "megafund" settlements, the size of the settlement may have an inverse relationship with the fees awarded. *See In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730 (N.D. Cal. 2015).

$25,000,000. *Id.* Out of that amount, approximately $16,037,970 was paid to 1,293,698 class members. *Id.* at 3. Class Counsel's petition for fees for 30% of the settlement amount, $7,500,000 was approved. *Id.* at 11. Notably, class counsel's approved fees were based on a 1.2 multiplier of their lodestar. *Id.* A $5,000 incentive award to the class representative was also approved. *Id.* at 12.

Resolution of the present case is comparable to *Stevenson*. In both cases, the plaintiffs, on behalf of a class of insureds, alleged that Allstate violated the UCL, which resulted in class members paying excess amounts. Both cases settled for a common fund. In *Stevenson,* the average award per class member was $13.13. *Id.* at 3. Here, the average award ($993.28) is much higher. Class counsel's attorneys' fee award in *Stevenson* was 30% of the total settlement fund, whereas here, Plaintiff's counsel is seeking one-third. However, the gross settlement fund in *Stevenson* was more than six times the amount here and a 1.2 multiplier was used. The incentive award of $5000 in *Stevenson* was agreed-upon by the parties and approved by the court.

### F.  The Notice Satisfied Due Process and Rule 23

The Class Notice satisfied Rule 23's requirement that notice be directed to "all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Notice was also issued "in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B).

In granting preliminary approval, this Court found that the Class Notice will "adequately provide Class Members with notice of the Settlement and their rights to be excluded or object." (Doc. 140 at ¶ 6.). This Court further approved of the Notice Plan, finding that it "constitutes the best and most practicable notice to Class Members under the circumstances and constitutes due and sufficient notice of the Final Approval Hearing and proposed Settlement Agreement and satisfies the requirements of Rule 23(c)(2) and due process." (Doc. 140 at ¶ 8.)

Data and information from the Settlement Administrator confirms that the Notice Plan was effective. Notices were mailed and delivered to 2510 out of 2517 Class Members, a

delivery percentage of 99.7%. (*See* Ex. B, Angeion Decl. at ¶ 6.) The Settlement Website has had approximately 4,411 page views and approximately 2,448 sessions, which represents the number of individual sessions initiated by all users on the website. *Id.* at ¶ 8. And the toll-free line has received approximately 13 calls, totaling 46 minutes. *Id.* at ¶ 9.

### G. The Distribution Plan

Class Members' settlement awards will be paid via check and sent by the Settlement Administrator, Angeion, to the same addresses used for the Class Notice. Class Notices were mailed to and presumed received for 2610 out of 2617 Class Members, a rate of 99.7%. As a result, the Parties anticipate that a similarly high percentage of Class Members will receive their settlement awards. As provided in the Settlement Agreement, in the event that any funds remain uncashed or unclaimed after 180 days (or such other later date if the Court so orders), the remaining funds will first be applied to any excess or unanticipated costs of the Settlement Administrator. If there are any remaining funds thereafter, Allstate will follow its standard escheatment procedures for the State of California. No funds will revert to Allstate.

## IV.    THE SERVICE AWARD SHOULD BE APPROVED

Pursuant to the Settlement Agreement, subject to this Court's approval, the Class Representative Tisha Hilario, would receive $20,000.00 for her service as the Class Representative in this case.

The relevant factors in assessing a service award "include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Stanton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003), citing *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). "Such awards are discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. West Publishing Corp.,* 563 F.3d 948, 958–959 (9th Cir. 2009). An award that is higher than the presumptively reasonable $5000 award is appropriate where the class representative "expend[ed] significant time and effort on

the litigation and face the risk of retaliation or other personal risks; where the class overall has greatly benefited from the class representatives' efforts, and where the incentive awards represent an insignificant percentage of the overall recovery." *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F.Supp.3d 508, 534 (N.D. Cal. 2020), *aff'd* 845 F.App'x 563 (9th Cir. 2021)

Here, but for Ms. Hilario's efforts and service as the lone class representative in this case, the Class Members would not have attained the substantial monetary relief secured through this Settlement. Ms. Hilario has been an exemplary class representative, she has consistently demonstrated a strong interest in pursuing relief on behalf of the Class, and she actively participated throughout the process. (Ex. E, Shane Decl. at ¶ 5.) Ms. Hilario has been available to Class Counsel throughout her more than five-year service as the Class Representative. *Id.* at ¶ 5. She wanted to be kept apprised of all important developments, asked questions, and took a legitimate interest in how the case was progressing and whether the class would get relief. *Id.* It is the opinion of Class Counsel that Ms. Hilario had a sincere desire to right this wrong on behalf of the more than 2500 class members. *Id.* She took her role seriously and graciously accepted the burdens associated with being a class representative. *Id.* She prepared very hard with Class Counsel for her deposition, understanding that it was an important deposition particularly because Allstate was taking the position that she was unharmed and that she was not typical of the class. *Id.* Ms. Hilario was engaged throughout the settlement process, both during the first private mediation, and later when she personally attended and actively participated in the mediation with Stephen Liacouras. *Id.*

Ms. Hilario wanted to be the class representative out of a sense of duty to help those who she understood to have paid unfair premiums as a result of Allstate double counting garage space. (Ex. N, Hilario Decl. at ¶ 1.) She undertook this responsibility notwithstanding that her personal damages were less than $1000. *Id.* She took her role as class representative very seriously and kept abreast of developments throughout the litigation through regular contact with Class Counsel, including about the challenges by Allstate to pleadings, the content of depositions, the reports prepared by experts, and the various audits produced by Allstate. *Id.* at ¶ 2.

Ms. Hilario estimates that she spent 40-50 hours in this case. *Id.* at ¶ 7. She worked with Class Counsel to answer written discovery and searched for responsive documents in her possession. (Ex. E, Shane Decl. at ¶ 5.) Ms. Hilario spent many hours preparing for her deposition as well as the deposition of her husband. (Ex. N, Hilario Decl. at ¶ 3.) She sat for a deposition at Class Counsel's office. *Id.* She was present for two inspections of her house. *Id.* at ¶ 4. And she attended and participated in the full-day mediation. *Id.* at ¶ 5.

Ms. Hilario was also personally concerned about the defenses Allstate raised and her ability to secure insurance. When she purchased her home many years ago, there were some improvements for which the prior owners did not get permits. *Id.* at ¶ 4. Allstate made this an issue in the case by taking measurements of Ms. Hilario's home and arguing she had "unpermitted construction" that was never reported to Allstate and had impacted the square footage of her home. (Doc. 77 at 12-13.) After learning that Allstate was arguing there was unpermitted property, which Ms. Hilario perceived that as questioning her integrity, which bothered her and caused her stress. (Ex. N, Hilario Decl. at ¶ 4.) Serving as a class representative also caused her to worry about her personal insurance situation. *Id.* at ¶ 6. She presumed that Allstate would not be happy with her and, during the course of the litigation, she had to obtain alternative insurance after having been insured by Allstate for decades. *Id.*

The proposed service award of $20,000 is supported by similar cases. In *Ross v. U.S. Bank Nat. Ass'n*, 2010 WL 3833922 (N.D. Cal. Sept. 29, 2010), a service award of $20,000 for each of four class representatives was approved by the court. In so doing, the court noted that the class representatives made substantial contributions, including reviewing document productions, having their depositions taken, and attending the mediation. *Id.* at *2. Ms. Hilario did at least as much here. The court in *Ross* also noted the potential stigma that the class representatives may face from the banking industry (*id.*), which is not unlike the feelings Ms. Hilario had about the insurance industry. *See also Marshall v. Northrop Grumman Corp.*, 2020 WL 5668935, at *8 (C.D. Cal. Sept. 18, 2020) (approving $25,000 to each of six class representatives, collectively totaling 1.2% of the settlement fund); *Mostajo v. Nationwide Mut. Ins. Co.*, 2023 WL 2918657 (E.D. Cal. Apr. 12, 2023) (approving a $25,000 service award to

1   each of the class representatives in a class action that settled for $3,800,000); *Thieriot v. Celtic*

2   *Ins. Co.*, 2011 WL 1522385, at *5-6 (N.D. Cal. Apr. 21, 2011) (approving $25,000 service award

3   in a class action that settled for $1,375,000); *Linney v. Cellular Alaska Partnership*, 1997 WL

4   450064, at *7 (approving $25,000 incentive awards to both class representatives in a class

5   action that settled for $6,000,000).

6        Importantly, the proposed service award to Ms. Hilario is only 0.5% of the gross

7   settlement fund. It is also in fair proportion to the settlement awards to class members given

8   that seven (7) class members will receive at least $4,000.00 as an award and seventeen (17) will

9   receive at least $2,000.00.

10   **V.**    **THE FEE AWARD SHOULD BE APPROVED**

11        Pursuant to the Settlement Agreement, Class Counsel is to receive one-third of the total

12   settlement fund, or $1,333,333.33. The proposed fee award was specifically noted in the Class

13   Notice and there were no objections.

14   While there is generally considered to be a 25% benchmark used in the Ninth Circuit, in cases

15   like this, with a common fund, the proper metric is whether the fee is "reasonable under the

16   circumstances." *In re Washington Public Power Supply System Securities Litig.*, 19 F.3d 1291, 1295 at

17   n.2. (9th Cir. 1994). "[I]n most common fund cases, the award exceeds that benchmark." *In re*

18   *Omnivision Techs., Inc.*, 559 F.Supp.2d 1036, 1047 (N.D. Cal. Jan. 8, 2008); *see also Marshall v.*

19   *Northrop Grumman Corp.*, 2020 WL 5668935, at *8 (C.D. Cal. Sept. 18, 2020) ("[a]n attorney fee

20   of one third of the settlement fund is routinely found to be reasonable in class actions.").

21   "Nationally, the average percentage of the fund award in class actions is approximately one-

22   third." *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 2009WL 9200391, at *4

23   (C.D. Cal. June 24, 2009). "Empirical studies show that, regardless whether the percentage

24   method or the lodestar method is used, fee awards in class actions average around one-third of

25   the recovery." 4 Newberg and Conte, *Newberg on Class Actions* § 14.6 (4th ed.2007); *see also Romero*

26   *v. Producers Dairy Foods, Inc.*, 2007 WL 3492841, at *4 (E.D. Cal. Nov. 14, 2007). As a result, "an

27   award of one third is within the range of percentages which courts have considered." *Boyd v.*

28   *Bank of America Corp.*, 2014 WL 6473804, *10 (C.D. Cal. Nov. 18, 2014); *Thieriot*, 2011 WL

1522385 at *5-6 (approving a one-third fee in a class action case that settled for $1,375,000); *Linney v. Cellular Alaska Partnership*, 1997 WL 450064 at *7 (N.D. Cal. 1997)(approving a one-third fee in a class action that settled for $6,000,000); *In re Pacific Enterprises Securities Litig.*, 47 F.3d 373, 379 (9th Cir. 1995)(approving a one-third fee award in derivative case that settled for $12,000,000).

Consideration of the factors recognized by the Ninth Circuit supports the proposed Fee Award. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir.2002).

### *The Results Achieved*

The main factor in assessing the reasonableness of fees is the result achieved. *In re Heritage Bond Litig.*, 2005 WL 1594389, at * 8 (C.D. Cal. June 10, 2005)("courts have consistently recognized that the result achieved is a major factor be considered in making a fee award); *In re Stable Rd. Acquisition Corp.*, 2024 WL 3643393, at * 12 (C.D. Cal. Apr. 23, 2024) (same); *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, (1983) ("the most critical factor is the degree of success obtained"). Here, as discussed above, the recovery achieved for the class—86.09% of the potential damages—is an excellent result that was achieved after more than five years of hotly contested litigation.

It should also be noted that Class Counsel's efforts (and those of its consultant's) were critical in uncovering Allstate's alleged wrongdoing, which was subtle, complex, and only applicable to a small fraction of Allstate homeowners' policyholders in California. Allstate disputed Plaintiff's allegations at every step of the way and mounted a vigorous defense; meaning Plaintiff could have received nothing for all of their efforts and expenses. Yet, Plaintiff and Class Counsel persisted in their efforts and obtained an outstanding recovery on behalf of the Class. Plaintiff submits that this "most critical factor" weighs heavily in favor of approving the proposed Fee Award.

### *The Risks of Litigation, the Contingent Nature of the Representation, and the Opportunity Cost in Brining the Suit*

This matter was taken on a contingency fee basis and lasted more than five years. Class Counsel incurred substantial time working on this matter, more than 2250 hours, without any

guarantee there would be an outcome. Class Counsel also incurred more than $132,723.72 in expenses, prior to engagement of the Settlement Administrator.

Hart McLaughlin & Eldridge bills hourly for many client matters. (Ex. C, Eldridge Decl. at ¶ 12.) Some of the attorney hours spent on this case would have otherwise generated hourly revenue. *Id.* Additionally, both Hart McLaughlin & Eldridge and Shane Law work on contingency fee matters. (Ex. C, Eldridge Decl. at ¶ 12; Ex. E, Shane Decl. at ¶ 6.) The attorney time required for prosecuting this case necessarily reduced the hours the firms could spend on other contingency fee matters. (Ex. C, Eldridge Decl. at ¶ 12; Ex. E, Shane Decl. at ¶ 6.)

### *Whether there are Benefits to the Class Beyond the Generation of a Cash Fund*

Class Counsel views accountability as an important objective in class litigation. There is evidence that Allstate was aware of the potential premium overcharges and took no action until this case was resolved. Additionally, the Class Notice contains an advisement to all Class Members that Allstate's record of square footage may be out of alignment with the current, actual square footage. To the extent Allstate insureds' square footage is corrected through this litigation, that would be provide an additional benefit beyond the settlement funds.

### *Reactions from the Class*

Only one Class Member opted out and no objections were filed. Especially given the high percentage of Class Members who received notice, this is strongly indicative of a favorable response from the Class. There is also little doubt that Class Members, who will receive an average of $993.28, will be pleased when they receive their settlement funds.

### *Lodestar Cross-Check*

"The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). "[C]ourts have discretion to apply a positive multiplier after considering factors such as: the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of

nonpayment." *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1010 (N.D. Cal. 2015).

Not including the briefing associated with the present motion, Class Counsel has spent 2,254.7 hours on this matter. (Ex. C, Eldridge Decl. at ¶ 7). The vast majority of time, 1,734.3 hours, was partner level time. *Id.* at ¶ 9. A detailed review of all timekeepers, hours, and billing activity is set forth the Declaration of Brian Eldridge, attached as Exhibit C. The total lodestar is $1,542,748.00. *Id.* at ¶ 8. The hourly rates applied are $750 for partners, $600 for associates, and $175 for paralegals and law clerks. *Id.* at ¶ 9. The lodestar is less than the fee award sought and, therefore, no multiplier is sought. However, if this Court were to reduce Class Counsel's proposed rates such that the one-third fee was greater than the lodestar, a modest multiplier should respectfully be considered based upon the exceptional result attained for the Class.

The comparable cases cited above support the proposed Fee Award. *Thieriot* involved a class action against an insurance company for allegedly increasing premiums. *Thieriot v. Celtic Ins. Co.*, 2011 WL 1522385 (N.D. Cal. 2011), 10-cv-04462. Class counsel's fee award for one-third of the settlement amount, $458,333, was approved. *Id.* at 6. Notably, class counsel's approved fees were based on a 1.9 multiplier of their lodestar. *Id.* at 7. The hourly rates submitted by class counsel in *Thieriot* in support of their fee request were $475-$675 per hour and $135-$210 per hour for paralegals, but that was for work done in 2010 and 2011. (See Ex. J, *Thieriot* Motion.)

*Yearby* involved a class action against an insurance company alleging that it inaccurately calculated cost of insurance rates. *Yearby v. American Nat'l Ins. Co.*, 20-cv-09222-EMC (N.D. Cal. 2023). Class counsel's fee award of $1,250,000 was approved. (Ex. G, Final Approval Order, at ¶ 2.) The fee award was based off 864.2 hours of work, with attorney hourly rates from $600 to $1300 and paralegal hourly rates of $275 to $400. (Ex. K, *Yearby* Decl. at ¶¶ 29-30.) Notably, the proposed Fee Award here ($1,333,333.33) is only slightly less than that awarded in *Yearby* ($1,250,000.00), but is based upon more than 2.5x the number of hours (2254 vs. 864).

*Miller* involved a class action alleging that the defendants, including certain insurance companies, unfairly required consumers to pay a fee for services in addition to the authorized premium. *Miller v. Travel Guard*, 2024 WL 534115 at *7. Class counsel's fee award of $7,199,250 was approved. (Ex. H, *Miller* Order Granting Final Approval, at 11-13.) The hourly rates submitted in support of the fee petition in *Miller* were $870 to $1410 per hour for attorneys and $380 to $420 per hour for paralegals. (Ex. L, *Miller* Motion at p. 31.)

*Stevenson* involved a case against Allstate for rate factors associated with auto insurance. *Stevenson v. Allstate Ins. Co.*, 15-cv-4788-YGR (N.D. Cal. 2024). Class Counsel's fee award of $7,500,000 was approved. *Id.* at 11. The hourly rates submitted in support of the fee petition in *Stevenson* were $500 to $1075 for attorneys, and $325 to $395 for paralegals. (Ex. M, *Stevenson* Motion at p. 9.)

In consideration of the extensive work performed by Class Counsel (2254 hours), the complexity of the work (including a successful outcome in the Ninth Circuit), and the excellent result achieved on behalf of the Class, the proposed Fee Award should be approved.

## VI.    REIMBURSEMENT OF EXPENSES SHOULD BE APPROVED

Finally, pursuant to the Settlement Agreement and subject to this Court's approval, Class Counsel would recover $168,604.72 in costs and expenses incurred in prosecuting this case and administering the Settlement. Of that, $35,881 is for the Settlement Administrator, Angeion Group. (Ex. C, Eldridge Decl. at ¶ 11.) The balance of the expenses, $132,723.72, largely consist of deposition expenses, costs associated with Ms. Hilario's home inspection, expenses for the private mediation, filing fees, and travel expenses. All expenses to the penny are accounted for the Declaration of Brian Eldridge (Ex. C, at ¶ 11.)

## VII.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court: (1) grant final approval of the proposed settlement described herein; (2) approve the Settlement; (3) approve the Service Award to the Class Representative; (4) approve the Fee Award; and (5) approve the reimbursable expenses.

Dated: November 18, 2025          By:    /s/ David Shane_____

                                         **SHANE LAW**
                                         David Shane (State Bar No. 109890)
                                         1000 Drakes Landing Rd #200
                                         Greenbrae, CA 94904-3027
                                         Telephone: (414) 464-2020
                                         dshane@shanelaw1.com

                                  By:    /s/ Brian Eldridge_____

                                         **HART McLAUGHLIN & ELDRIDGE LLC**
                                         Brian Eldridge (State Bar No. 220822)
                                         Steven Hart (Pro Hac Vice)
                                         One South Dearborn, Suite 1400
                                         Chicago, Illinois 60603
                                         Telephone: (312) 955-0545
                                         beldridge@hmelegal.com
                                         shart@hmelegal.com

                                         *Attorneys for Plaintiff Tisha Hilario, individually and on*
                                         *behalf of a class of all others similarly situated*

1

## <u>CERTIFICATE OF SERVICE</u>

2

3   I hereby certify that on November 18, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

4

5   /s/ *Brian Eldridge*
    Brian Eldridge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28